IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

UNION CARBIDE CORPORATION,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

———————————————

ON PETITION FOR REVIEW OF AGENCY ACTIONS OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————————————

**RESPONDENTS' MOTION TO DISMISS**

———————————————

KATHERINE E. KONSCHNIK
*Acting Assistant Attorney General*

*Of Counsel:*
JORI REILLY-DIAKUN
BRIDGET EKLUND
  Office of the General Counsel
  U.S. Environmental Protection
  Agency
  Washington, D.C.

BRANDON N. ADKINS
*Senior Trial Counsel*
Environmental Defense Section
Environment and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 598-9562
Brandon.Adkins@usdoj.gov

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNION CARBIDE CORPORATION,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

_____

**CERTIFICATE OF INTERESTED PERSONS**
_____

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in

the outcome of this case. These representations are made in order that the judges of

this court may evaluate possible disqualification or recusal.

Union Carbide Corporation (Petitioner)
Latham & Watkins LLP (counsel for Petitioner)
Roman Martinez (counsel for Petitioner)
Julia Hatcher (counsel for Petitioner)
Stacey VanBelleghem (counsel for Petitioner)

> *s/Brandon N. Adkins*
> Attorney of record for Respondents

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 1

      A.    Statutory Background ............................................. 1

      B.    Ongoing Agency Consideration of 1,4-Dioxane...................... 4

ARGUMENT.................................................................................. 6

    I.    Congress Has Not Authorized Judicial Review of the Challenged Actions Before Risk-Management Regulations Are Finalized. ................................................................ 7

    II.    Review of the Withdrawal Order Would be Premature. ....................13

CONCLUSION ...............................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967)................................................................13, 14

*Bell v. New Jersey*,
    461 U.S. 773 (1983) ....................................................... 8

*Bennett v. Spear*,
    520 U.S. 154 (1997)....................................................... 7

*Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.*,
    843 F.2d 840 (5th Cir. 1988) ...............................................17

*Coliseum Square Ass'n v. Jackson*,
    465 F.3d 215 (5th Cir. 2006) ..............................................14

*Cooper v. McBeath*,
    11 F.3d 547 (5th Cir. 1994)................................................15

*Corrosion Proof Fittings v. EPA*,
    947 F.2d 1201 (5th Cir. 1991) ............................................. 2

*Duke Power Co. v. Carolina Env't Study Grp.*,
    438 U.S. 59 (1978)........................................................14

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023), *vacated as moot*, 144 S. Ct. 480 (2023)...............16

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ............................................. 8

*Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*,
    50 F.3d 1318 (5th Cir. 1995)............................................... 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................19

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ..................................................................... 7

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ...................................................................19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ...................................................................14

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
48 F.4th 306 (5th Cir. 2022) .....................................................16

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ............................................... 14, 15, 16, 17, 18

*Reno v. Catholic Soc. Servs. Inc.*,
509 U.S. 43 (1993) .....................................................................14

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) .....................................................15

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) ..............................................................14, 18

*Vinyl Inst., Inc. v. EPA*,
106 F.4th 1118 (D.C. Cir. 2024) ...............................................10

*Walmart Inc. v. U.S. Dep't of Justice*,
21 F.4th 300 (5th Cir. 2021) .................................................14, 17

**Statutes**

5 U.S.C. § 704 ...............................................................................13

15 U.S.C. §§ 2601–2629 ................................................................ 7

15 U.S.C. § 2601 ........................................................................... 2

15 U.S.C. § 2602 ........................................................................... 3

15 U.S.C. § 2605........................................................ 3, 4, 5, 8, 9, 11, 12, 13, 16, 17, 18

15 U.S.C. § 2605(a) (1976) ............................................................. 2

15 U.S.C. § 2608............................................................................4, 18

15 U.S.C. § 2618............................................................................7, 8, 12

15 U.S.C. § 2619............................................................................16

15 U.S.C. § 2620............................................................................11

Pub. L. No. 114-182, 130 Stat. 448 (2016)......................................2, 10

**Federal Register Publications**

81 Fed. Reg. 91927 (Dec. 19, 2016)....................................................... 4

86 Fed. Reg. 1495 (Jan. 8, 2021)........................................................4, 5

88 Fed. Reg. 43562 (July 10, 2023) ....................................................... 5

88 Fed. Reg. 48249 (July 26, 2023) ....................................................5, 6

89 Fed. Reg. 89993 (Nov. 14, 2024) ....................................................... 6

**Congressional Materials**

162 Cong. Rec. 3516 (2016) ................................................................. 2

H.R. Rep. No. 114-176 (2015) ..............................................................10

S. Rep. No. 94-698 (1976) ................................................................. 2

S. Rep. No. 114-67 (2015) ..............................................................10

**INTRODUCTION**

This petition is not justiciable and should be dismissed.

Congress established a detailed process for prioritizing, evaluating, and—when appropriate—regulating chemical substances. In doing so, Congress also identified when agency decisions along that regulatory path are considered "final agency action" for judicial review. The Environmental Protection Agency ("EPA") began, but has not yet completed, this regulatory process for a chemical substance called 1,4-dioxane. A chemical manufacturer, Union Carbide, petitioned for review of three intermediate actions. None of the actions is final and reviewable, and none will be until EPA completes a rule to manage the unreasonable risk from 1,4-dioxane.

One of the three challenged actions—an order withdrawing superseded determinations of risk—is not justiciable for another reason: it is not ripe for review. Delaying review of that order until EPA finalizes a rule to manage unreasonable risk will cause Union Carbide no hardship. The withdrawal order commands no one to do anything and poses no practical harm to Union Carbide.

**BACKGROUND**

**A.      Statutory Background**

In 1976, Congress enacted the Toxic Substances Control Act ("TSCA") "to prevent unreasonable risks of injury to health or the environment associated with

the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S. Rep. No. 94-698, at 1 (1976), as reprinted in 1976 U.S.C.C.A.N. 4491; *see* 15 U.S.C. § 2601(b)(2)–(3) (statements of policy).

Before 2016, TSCA authorized EPA to regulate chemical substances if the Agency found there was a "reasonable basis" to conclude that their manufacture, processing, distribution, use, or disposal "presents or will present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a) (1976). Determining whether a chemical presented an "unreasonable risk" relied on cost-benefit balancing, and EPA was required to use the "least burdensome requirements" to address any identified unreasonable risk. *See Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1215 (5th Cir. 1991). As originally enacted, TSCA did not provide a specific process or timeline by which EPA was required to assess and manage a chemical substance's unreasonable risks.

In 2016, Congress amended TSCA by enacting the Frank R. Lautenberg Chemical Safety for the 21st Century Act. Pub. L. No. 114-182, 130 Stat. 448 (June 22, 2016). The 2016 amendments "set[] in motion a process under which EPA will for the first time systematically review the safety of chemicals in active commerce." 162 Cong. Rec. at S3516 col. 3 (June 7, 2016). This generally occurs over a three-step process: prioritization, risk evaluation, and risk management.

EPA first screens chemical substances to prioritize them for risk evaluation. 15 U.S.C. § 2605(b)(1). Relevant here, Congress required that EPA conduct initial risk evaluations on ten chemical substances drawn from an existing list of chemicals called the 2014 update of the TSCA Work Plan for Chemical Assessments, rather than through the prioritization process. *Id.* § 2605(b)(2)(A).

EPA conducts risk evaluations "to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, . . . under the conditions of use." *Id.* § 2605(b)(4)(A). "Conditions of use" are "the circumstances, as determined by [EPA], under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4).

If EPA determines a chemical substance does not present unreasonable risk, then the regulatory process ends. EPA must issue its no-unreasonable-risk determination by order. *Id.* § 2605(i)(1). Congress provided that such an order is considered "final agency action." *Id.* But if the Agency determines the chemical substance presents unreasonable risk, then the process continues.

Where EPA determines that a chemical substance presents unreasonable risk, EPA must propose within a year a rule to address that unreasonable risk and

finalize that rule within two years. *Id*. § 2605(a)(1), (c)(1)(A)–(B).[1] EPA may extend those deadlines for not more than two years. *Id.* § 2605(c)(1)(C). A risk-management rule must impose requirements as needed to address the unreasonable risk. *Id*. § 2605(a). Section 2605(a) provides a menu of options to do so, ranging from a warning label to a total ban. *Id.* § 2605(a)(1)–(7). Congress provided that a risk-management rule, including the associated determination of unreasonable risk, is "considered to be final agency action." *Id.* § 2605(i)(2).

## B.    Ongoing Agency Consideration of 1,4-Dioxane

EPA selected 1,4-dioxane, a chemical substance on the 2014 update of the TSCA Work Plan for Chemical Assessments, as one of its initial risk evaluations following the 2016 TSCA amendments. 81 Fed. Reg. 91927, 91928 (Dec. 19, 2016); *see* 15 U.S.C. § 2605(b)(2)(A). 1,4-Dioxane is used mainly as a solvent in a variety of commercial and industrial applications. In December 2020, EPA published its final risk evaluation for 1,4-dioxane. 86 Fed. Reg. 1495 (Jan. 8, 2021) (notice of availability of risk evaluation). In the risk evaluation, EPA concluded that certain conditions of use for 1,4-dioxane present unreasonable risk, while other conditions of use do not. *Id.* At that time, the Agency made risk determinations for

---

[1]    In some cases, EPA may promulgate exemptions or refer action on an identified unreasonable risk to another federal agency or program within EPA. *See* 15 U.S.C. §§ 2605(g), 2608(a)–(b).

each condition of use considered. A subsection of the risk evaluation containing EPA's no-unreasonable-risk determinations for certain conditions of use constituted the order required by section 2605(i)(1). *Id.* at 1496.

In early 2021, states and advocacy groups petitioned for review of EPA's no-unreasonable-risk determinations for 1,4-dioxane. The cases were consolidated in the Ninth Circuit. *See Env't Def. Fund v. EPA*, No. 21-70162 (9th Cir.). EPA moved for voluntary remand so that it could revisit certain policies underlying the no-unreasonable-risk determinations. Those policies included the Agency's approach in making the 1,4-dioxane risk determinations for each condition of use (rather than a single determination for the whole chemical), assumptions about workers' use of personal protective equipment, and decisions to exclude certain conditions of use and exposure pathways (like exposure by air or water). Mot. for Voluntary Remand 9–10, *Env't Def. Fund v. EPA*, No. 21-70162 (9th Cir.) (ECF No. 16). The Ninth Circuit granted that motion on August 10, 2021.

In July 2023, EPA published and solicited comments on a draft supplement to the December 2020 risk evaluation for 1,4-dioxane. 88 Fed. Reg. 43562 (July 10, 2023) (noticing availability of draft supplement). And that same month, EPA published and solicited comments on a draft revised risk determination. 88 Fed. Reg. 48249 (July 26, 2023) (noticing availability of draft revised risk determination). The draft proposed a single determination of unreasonable risk for

1,4-dioxane as a whole that would supersede the previous condition-of-use-specific determinations. *Id.* at 48249–50. It also encompassed additional conditions of use and exposure pathways for 1,4-dioxane evaluated in the draft supplement and evaluated risk to workers without assuming that they always appropriately wear personal protective equipment. *Id.* at 48250.

In November 2024, after reviewing public and peer review comments, EPA published a final supplement to the 1,4-dioxane risk evaluation and a revised unreasonable-risk determination. 89 Fed. Reg. 89993 (Nov. 14, 2024); *see also* Pet. Ex. C (supplement); Pet. Ex. B (revised risk determination). As proposed, EPA determined that 1,4-dioxane presents unreasonable risk to human health. 89 Fed. Reg. at 89994. The revised unreasonable-risk determination superseded EPA's previous condition-of-use-specific determinations in the 2020 risk evaluation and withdrew the associated section 2605(i)(1) order. *Id.*; Pet. Ex. B (Section 6.5 Order Withdrawing TSCA Section [2605](i)(1) Order).

EPA is in the early stages of risk-management actions to address the unreasonable risk identified for 1,4-dioxane.

## ARGUMENT

Union Carbide petitioned for review of three EPA actions: (1) the revised determination that 1,4-dioxane presents unreasonable risk; (2) the supplement to the risk evaluation for 1,4-dioxane; and (3) the order withdrawing EPA's previous

determination that certain conditions of use for 1,4-dioxane do not present unreasonable risk. None of these actions is considered final agency action under TSCA. And the withdrawal order is not justiciable also because it is not yet ripe for review.

## I. Congress Has Not Authorized Judicial Review of the Challenged Actions Before Risk-Management Regulations Are Finalized.

Union Carbide invokes this Court's jurisdiction under TSCA's judicial-review provision. Pet. 2 (citing 15 U.S.C. § 2618(a)(1)(A)). That provision authorizes judicial review of a "rule" promulgated under TSCA title I (15 U.S.C. §§ 2601–2629) or order issued under 15 U.S.C. § 2605(i)(1), among other actions. *See* 15 U.S.C. § 2618(a)(1)(A).

Agency action must be final before the Judicial Branch intervenes. To be so, the action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). To be sure, section 2618 does not expressly state that agency action must be "final." Rather, a finality requirement is presumed unless Congress provides otherwise. *E.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) ("Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific 'final

agency action' has an actual or immediately threatened effect."); *Bell v. New Jersey*, 461 U.S. 773, 778 (1983) ("The strong presumption is that judicial review will be available only when agency action becomes final, and there is nothing in § 455 [General Education Provisions Act] to overcome that presumption." (cleaned up)); *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1325 (5th Cir. 1995) ("The judiciary should intervene to review agency action only when, and to the extent, that such action has an actual or immediately threatened effect." (cleaned up)); *see Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380–81 (D.C. Cir. 2002) (considering whether guidance document is final agency action in challenge brought under TSCA).

There is no signal in TSCA that Congress meant to weaken or negate the finality requirement. Just the opposite: it spelled out when actions under section 2605 are considered final. 15 U.S.C. § 2605(i).[2] A determination that a chemical substance does *not* present unreasonable risk is "considered to be a final agency action, effective beginning on the date of issuance of the order." *Id.* § 2605(i)(1). And a risk-management rule, including the associated determination of unreasonable risk, is "considered to be a final agency action, effective beginning

---

[2] Although not relevant here, Congress also authorized judicial review of a designation that a chemical substance is a low-priority substance. 15 U.S.C. § 2618(a)(1)(C)(i).

on the date of promulgation of the final rule." *Id.* § 2605(i)(2).[3] Relevant here, EPA's determination that a chemical substance *does* present unreasonable risk is not "final agency action" until EPA finalizes an associated risk-management rule. *See id.*

This sequencing makes sense. After all, the regulatory process under section 2605 comes to an end in two situations: (1) when EPA determines a chemical substance does *not* present unreasonable risk (considered "final agency action" under section 2605(i)(1)); or (2) when EPA issues a final rule to manage unreasonable risk (considered, together with the associated determination of unreasonable risk, "final agency action" under section 2605(i)(2)). In the latter outcome, an unreasonable-risk determination is an intermediate step on the road to a final risk-management rule. The legal effect of that determination is that EPA must promulgate a risk-management rule—the actual regulation of the chemical substance. Though a potential litigant might fear that those restrictions will be overly burdensome, the risk-management process may instead result in regulations that assuage those fears and do not ultimately warrant a lawsuit. Congress's chosen

---

[3] Though TSCA refers to some intermediate steps in the regulatory process as "final," Congress still did not identify those decisions as "final agency action" for judicial review. *See, e.g., id.* § 2605(b)(1)(C) ("final prioritization designation," where EPA designates the chemical substance as high-priority); *id.* § 2605(b)(4)(H) ("final risk evaluation," where EPA determines that the chemical substance presents unreasonable risk).

scheme, then, saves party and judicial resources by requiring potential litigants to wait until a regulation is final and has concrete effects.

Further, delaying judicial review of intermediate determinations of unreasonable risk until a risk-management rule is finalized also aligns with Congress' intent to expedite EPA's review of chemicals. Congress established section 2605(i) in the 2016 amendments. *See* Pub. L. 114-182, 130 Stat. 469–70 (2016). Before enactment, Congress acknowledged "persistent concerns" over "EPA's slow pace" in implementing TSCA. H.R. Rep. No. 114-176, at 12–13 (2015). The amendments were thus aimed at "increasing through-put" and thereby "addressing the backlog of unassessed chemicals." S. Rep. No. 114-67, at 13 (2015); *see also Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1122 (D.C. Cir. 2024) ("By the 2010s, the Congress expressed 'persistent concerns' regarding the EPA's slow pace in implementing the TSCA, and so—recognizing shortcomings based on statutory structure, court decisions and the EPA's interpretation of those decisions—it revised the statute via the 2016 Amendments." (internal citations omitted)). Having litigation at each intermediate step in the regulatory process would diverge from congressional intent.

Application of the statute to the three actions identified in the Petition is straightforward. Whether two of the three agency actions the Petition identifies are final is directly answered by section 2605(i)(2). Neither the determination that

1,4-dioxane presents unreasonable risk nor the supplement to the risk evaluation for 1,4-dioxane (the technical analysis that supports that determination) is reviewable final agency action until EPA finalizes a risk-management rule. *See* 15 U.S.C. § 2605(i)(2).

The same analysis also applies to whether the third agency action—EPA's order withdrawing previous determinations of unreasonable risk—is considered "final." The withdrawal order is part and parcel of the November 2024 superseding determinations of unreasonable risk, which are not yet "final agency action." *Id.* The withdrawal order also shares the same interlocutory qualities as a determination of unreasonable risk. That is, the regulatory process for 1,4-dioxane does not end with the withdrawal order. EPA must now finalize a risk-management rule. And when it does, the rule and associated determination of unreasonable risk, including the withdrawal order, will all be considered final agency action for judicial review. *See id.*

Deferring judicial review of EPA's withdrawal of the section 2605(i)(1) order—which is inseparable from the now-controlling unreasonable-risk determination—best harmonizes Congress's statutory purposes. Congress contemplated that EPA may have to modify or revoke past decisions under section 2605. For example, TSCA authorizes any person to petition EPA to start a proceeding to amend or repeal a risk-management rule. *See id.* § 2620(a). And

section 2618 discusses when EPA may set aside a section 2605(i)(1) order undergoing judicial review and file a new or modified order with the court. *Id.* § 2618(b). Permitting early review of superseding Agency decisions under section 2605 that ordinarily must await a risk-management rule merely because EPA revisited the superseded action would disrupt the sequencing of judicial review that Congress established.[4]

So, even as the December 2020 order containing the *no*-unreasonable-risk determinations was considered "final agency action" under section 2605(i)(1), the order withdrawing those superseded determinations is not. And under no reasonable interpretation can the withdrawal order be characterized as a determination that 1,4-dioxane "does not present an unreasonable risk," *id.* § 2605(i)(1), as Union Carbide's petition suggests, Pet. 2. Its effect is just the opposite.

---

[4] Review of EPA's regulation of a different chemical substance, methylene chloride, is a useful exemplar of when review of the actions Union Carbide challenges here should occur. *E. Fork Enters. v. EPA*, No. 24-60227 (5th Cir.). Like 1,4-dioxane, EPA withdrew prior section 2605(i)(1) determinations of no unreasonable risk for methylene chloride and made a single unreasonable-risk determination for the whole chemical substance. Resp't Br. 25, 5th Cir. Case No. 24-60227 (ECF No. 129). EPA then finalized a risk-management rule. The petitioners appropriately waited to seek review of EPA's regulatory actions for methylene chloride until finalization of the risk-management rule.

In sum, the withdrawal order is not yet "final agency action" because Congress did not make it so, by word or implication. Review of the withdrawal order now would stray from the statute and diverge from Congress' intent reflected in the statutory scheme. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (considering whether context of legislative scheme reflects congressional purpose to restrict access to judicial review). Union Carbide may seek review of each of the intermediate actions identified in the Petition *after* EPA issues a final rule for 1,4-dioxane, when those actions will be "considered . . . final." 15 U.S.C. § 2605(i)(2); *cf.* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

## II. Review of the Withdrawal Order Would be Premature.

Even if the Court determines the withdrawal order is "final agency action" now, judicial review before EPA finalizes a risk-management rule would be premature.

The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys*, 387 U.S. at 148–49. The

doctrine grows out of Article III's limitation of judicial power to "Cases" and "Controversies" and prudential reasons for declining jurisdiction. *Reno v. Catholic Soc. Servs. Inc.*, 509 U.S. 43, 57 n.18 (1993). Review of agency action may not be ripe even where that action is considered "final agency action." *See Abbott Lab'ys*, 387 U.S. at 149; *see, e.g.*, *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 82 (1978); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162–63 (1967).

To determine whether administrative action is ripe for judicial review, courts examine the "hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." *Nat'l Park Hosp. Ass'n*, 528 U.S. at 808. That inquiry has generally been guided by three factors: "whether delayed review would cause hardship to the plaintiffs"; "whether judicial intervention would inappropriately interfere with further administrative action"; and "whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *e.g.*, *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 245 (5th Cir. 2006). Failure on any one factor can render a case unfit for judicial review. *See Walmart, Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 311 (5th Cir. 2021).

Union Carbide's claim is not ripe for review. First, Union Carbide will suffer no hardship from withholding court consideration of the withdrawal order

14

because it imposes no burden on them. Substantial hardship is the "touchstone for determin[ing] when review i[s] appropriate." *Cooper v. McBeath*, 11 F.3d 547, 552 n.7 (5th Cir. 1994). Hardship can take the form of "legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced to modify one's behavior in order to avoid future adverse consequences." *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (cleaned up).

The withdrawal order poses no legal harm to Union Carbide. In *Ohio Forestry*, the Court considered a challenge to the lawfulness of a U.S. Forest Service management plan because, the petitioner argued, it permitted too much logging and clearcutting. 523 U.S. at 728–29. The plan identified areas and methods for timber production and even made logging more likely. *Id.* at 729–30. But the plan itself gave no right to cut trees and abolished no right to object. *Id.* at 733. Withholding review of the plan thus did not cause such legal hardship to make review ripe. *Id.*

Like the challenged provisions in *Ohio Forestry*, the withdrawal order does "not command anyone to do anything or to refrain from doing anything; [it does] not grant, withhold, or modify any formal legal license, power, or authority; [it does] not subject anyone to any civil or criminal liability; [it does not] create [any] legal rights or obligations." 523 U.S. at 733. Its only practical significance is as the

counterpart to the superseding unreasonable-risk determination, which obligates EPA to proceed to risk-management rulemaking.

The lack of harm from the withdrawal order puts this case in contrast from others where the Court found the hardship prong was satisfied. For example, in *Feds for Medical Freedom v. Biden*, federal employees satisfied the hardship prong where a vaccination order required that they undergo irrevocable medical procedures. 63 F.4th 366, 386 (5th Cir. 2023), *vacated as moot*, 144 S. Ct. 480 (2023). And in *NextEra Energy Capital Holdings v. Lake*, an electricity-transmission company satisfied the hardship prong where it would have had to spend time and money seeking approval to build new transmission lines only to be denied under the challenged State law barring market entrants. 48 F.4th 306, 316 (5th Cir. 2022). Here, by contrast, the withdrawal order imposes no obligation on Union Carbide.

Nor does the withdrawal order inflict "significant practical harm," because Union Carbide will have "ample opportunity later" to challenge actions in the Petition after EPA finalizes a risk-management rule. *Ohio Forestry*, 523 U.S. at 733–34. EPA must finalize a risk-management rule within two years of the determination of unreasonable risk, which is November 14, 2026. *See* 15 U.S.C. § 2605(c)(1). Union Carbide will have access to judicial review either if EPA misses the statutory deadline, *id.* § 2619(a), or if EPA issues a final rule with

which Union Carbide disagrees (based on the content of the rule or the associated unreasonable-risk determination), *id.* §§ 2605(i)(2), 2618(a)(1)(A). The possibility of further consideration, therefore, "is not theoretical, but real." *Ohio Forestry*, 523 U.S. at 735; *see Walmart Inc.*, 21 F.4th at 312–13 (finding no hardship where retail chain could test government's regulatory positions by raising defenses in separate ongoing enforcement action); *Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.*, 843 F.2d 840, 846 (5th Cir. 1988) ("[A]ppellees' allegation of irremediable harm is further undermined by their failure to demonstrate that they will be unable to obtain effective judicial relief after a transfer of funds is ordered.").

Second, hearing Union Carbide's challenge now could "interfere with the system that Congress specified for the agency to reach [risk-management] decisions." *Ohio Forestry*, 523 U.S. at 736. Union Carbide's challenge to the withdrawal order is a not-so-subtle challenge to the determination of unreasonable risk and the associated risk evaluation. The basis for the withdrawal order *is* the superseding risk determination and supplement to the risk evaluation; as even the Petition admits, the "determinations and findings" of the revised risk determination and supplement to the risk evaluation "underlie the Section 6.5 Final Order [withdrawal order]." Pet. 2. But challenges to those "determinations and findings" as applied to 1,4-dioxane must await a final risk-management rule. *See* 15 U.S.C.

§ 2605(i)(1).[5] Hearing such challenges now under the guise of the withdrawal order would interfere with the sequencing Congress established. *See supra* Part I.

Third, the Court will benefit from awaiting EPA's finalization of a risk-management rule for 1,4-dioxane. That rule will be the last step in the section 2605 regulatory process for 1,4-dioxane and the real-world application of the policy decisions the Agency made along the way, including those underlying the revised risk determination and supplement to the risk evaluation, on which the withdrawal order is based. *See Ohio Forestry*, 523 U.S. at 736 (explaining that the ripeness doctrine seeks to avoid "abstract disagreements over administrative policies" (internal quotation marks omitted)). Thus, judicial review "is likely to stand on a much surer footing" after a risk-management rule is finalized. *Toilet Goods Ass'n*, 387 U.S. at 164.

The Court will also benefit from understanding whether and how those policy decisions affect Union Carbide considering whatever risk-management rule EPA finalizes—or indeed whether EPA even regulates in a way that impacts Union Carbide at all. *See, e.g.*, 15 U.S.C. § 2605(g) (authorizing exemptions); *id.* § 2608

---

[5] If Union Carbide wished to challenge *facially* the policy decisions to make a single risk determination for a chemical substance and without assuming the use of personal protective equipment, it had ample opportunity to join in active litigation on those decisions. *See AFL-CIO v. EPA*, No. 24-1151 (D.C. Cir.) (review of Risk-Evaluation Procedural Rule adopting whole-chemical approach).

(management of risk using other federal laws). But until a risk-management rule is final and imposes some legal or practical hardship, whether Union Carbide has suffered constitutional injury is merely speculative. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In this sense, the justiciability problem with the Petition "can be described in terms of standing (whether [Union Carbide] is threatened with imminent injury in fact fairly traceable to the challenged action of [EPA], or in terms of ripeness (whether there is sufficient hardship to the parties in withholding court consideration)." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (cleaned up). In either case, review of the withdrawal order is not justiciable currently.

## CONCLUSION

The Court should dismiss the Petition.[6]

Respectfully submitted,

KATHERINE E. KONSCHNIK
*Acting Assistant Attorney General*

*Of Counsel:*                          /s/ Brandon N. Adkins
JORI REILLY-DIAKUN          BRANDON N. ADKINS
BRIDGET EKLUND                *Senior Trial Counsel*
   Office of the General Counsel    Environmental Defense Section
   U.S. Environmental Protection    Environment and Natural Resources
   Agency                              Division
   Washington, D.C.                 U.S. Department of Justice

---

[6]   Undersigned counsel contacted Petitioner's counsel, who advised that Petitioner will file an opposition.

P.O. Box 7611
Washington, D.C.  20044
(202) 598-9562
Brandon.Adkins@usdoj.gov

JANUARY 17, 2025

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 4,211 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 17, 2025          *s/ Brandon N. Adkins*
                                       BRANDON N. ADKINS
                                       Attorney for Respondents